| | |
|---|---|
| O.B. *by next friend* Danielle Baker, *a minor child under eighteen (18) years of age*, <br><br> Plaintiff, <br><br> v. <br><br> RUTHERFORD COUNTY BOARD OF EDUCATION, <br><br> Defendant. | NO. 3:20-cv-00945 <br> JUDGE RICHARDSON |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's motion for summary judgment (Doc. No. 54) and Plaintiff's[1] motion for summary judgment (Doc. No. 57). Each party filed a response to the respective summary judgment motions. (Doc. Nos. 61, 63). Each party also filed a reply. (Doc. Nos. 67, 68). For the reasons stated herein, Defendant's motion for summary judgment will be granted, and Plaintiff's motion for summary judgment will be denied.

### BACKGROUND[2]

**1. The Incident**

During the relevant time period, Plaintiff was ten years old and was in the special education program at Walter Hill Elementary School ("WHES"). (Doc. No. 64 at 4). The special educational program for children was for those individuals with needs that could not be met in their regularly

---

[1] Hereinafter, "Plaintiff" refers to O.B. rather than his next friend, and so the Court uses masculine pronouns when referring to Plaintiff.

[2] The facts contained in this section are taken from the parties' statements of undisputed facts. (Doc. Nos. 62, 64). The facts are either undisputed or are treated as true for the purposes of summary judgment because the Court finds the record to demonstrate no genuine dispute as to them.

zoned school. (*Id.* at 2). Some of the most behaviorally difficult children in Rutherford County's school system were included in this program. (*Id.*). From 2004 to November 8, 2019, Helen Campbell was an employee of Defendant, the Rutherford County Board of Education. (*Id.* at 1). In 2013, she became the principal of WHES. (*Id.* at 2).

On November 4, 2019, Plaintiff was sitting in a chair in the front office of WHES. (*Id.* at 5).[3] Bonnie Marlar, one of Plaintiff's teachers, came to the front office to take Plaintiff to class. (Doc. No. 62 at 11). After Plaintiff refused to get up from where he was sitting, Marlar and Campbell grabbed hold of Plaintiff. (*Id.* at 11–12, Doc. No. 76[4]). Specifically, Campbell and Marlar attempted what is known as a crisis prevention intervention or "CPI" hold, but they were unsuccessful; Plaintiff continued to refuse to get up and walk to class. (Doc. No. 64 at 6). Campbell and Marlar proceeded to grab Plaintiff by the legs of his trousers and drag him through the school hallways for over 500 feet to what is known as the "calming room." (Doc. Nos. 64 at 6, 62 at 15). The "calming room" is a designated safe space where children experiencing behavioral episodes are taken to calm down. (Doc. No. 64 at 2).

The video surveillance footage submitted by Defendant clearly shows that during Plaintiff's entire interaction with Campbell and Marlar, Plaintiff's behavior was completely passive. (Doc. No. 76). He was not kicking or otherwise physically lashing out at Campbell or Marlar. (*Id.*). Plaintiff was instead sitting in the chair passively refusing to get up by acting

---

[3] The Court notes that there is a discrepancy between the amended complaint and other relevant filings regarding the date of the incident (*i.e.*, the date on which Campbell and Marlar dragged Plaintiff by his trouser legs). The amended complaint states that the incident took place on November 4, 2020. (Doc. No. 8 at 5). The parties' respective statements of undisputed facts, however, show that it is undisputed that the incident took place on November 4, 2019. The Court therefore treats November 4, 2019 as the date on which the incident occurred for the purposes of summary judgment.

[4] These are the surveillance videos, taken from within the school, that show Campbell's and Marlar's interactions with Plaintiff in the front office and their subsequent dragging of Plaintiff down the school hallways.

completely limp. (*Id.*). Even when Campbell and Marlar lifted Plaintiff out of the chair, he remained passive. At some point during the 500-foot journey from the front office to the calming room, the footage shows Plaintiff struggling—he reaches for one of his legs as he is being dragged and attempts to twist on to his stomach. But he was unsuccessful in what appears to be an attempt to free himself, and Marlar and Campbell continued to drag him down the long school hallway. (*Id.*).

2. **Relevant Policies and Law on the Use of Restraints**

Defendant's policy states that "[s]tudents receiving special education services shall not be restrained, except as permitted by law." (Doc. No. 55 at 10). The Tennessee Code states that "[a] student receiving special education services, as defined by § 49-10-102, may be restrained or isolated only in emergency situations." *See* Tenn. Code Ann. § 49-10-1304(a). A "[p]hysical holding restraint" (hereinafter, a "restraint") "means the use of body contact by school personnel with a student to restrict freedom of movement or normal access to the student's body." *See* Tenn. Code Ann. § 49-10-1303(8). An "emergency situation" means "that a child's behavior poses a threat to the physical safety of the student or others nearby." Tenn. Code Ann. § 49-10-1303(3). At the time of the incident, the Tennessee Code further provided that a restraint is not prohibited where "[t]he minimum contact necessary to physically escort a student from one area to another" is used. *See id.* at § 49-10-1305(e)(3)(A)(ii).[5]

---

[5] Pursuant to 2021 amendments to the Tennessee Code, this provision was deleted. The parties do not dispute that the relevant version of the Tennessee Code is the version that existed on November 4, 2019. Thus, the Court's analysis takes account of this now-deleted provision, although the Court uses the past tense when referring to this provision or the effects of this provision.

The Court acknowledges that there were some internal contradictions in the Tennessee Code. For example, it is odd that the Code clearly states that a restraint may be used only in emergency situations but went on to permit restraints to relocate a student if the minimal contact necessary is used. To the extent that such permission allowed restraints (provided that the minimum contact necessary is used) even in cases where

Defendant also has a written policy regarding relocation of students in WHES. The policy states in part that "[e]mployees . . . may relocate a student from the student's present location to another location when such relocation is necessary for the student's safety or the safety of others. . . . Reasonable force may be used to physically relocate . . . if a student is unwilling to cooperate." (Doc. No. 55 at 11, quoting Defendant Policy 6.4081). The policy goes onto state that "[i]n the event that physical relocation becomes necessary, the teacher shall immediately file a brief report of the incident with the building principal." (Doc. No. 59 at 15).

On September 11, 2016, Defendant sent an email to principals, including Campbell, offering guidance on what constitutes a restraint. (Doc. No. 61 at 7).[6] The email stated as follows:

---

the relocation is not the result of an "emergency," it runs counter to the rule that restraints be used only in emergencies. The Court, however, understands these provisions to have essentially allowed a restraint to be used to escort a student (even in non-emergency situations), as long as the restraint used the minimum contact necessary, and therefore educators were not free to use any form of restraint in such a situation.

One of the reasons the Court adopts this understanding is that any other understanding would suggest that restraints in emergency situations need not involve the minimal contact necessary, which seems an unlikely suggestion to make; if the special rule regarding relocation does not exist to make clear that restraints (with the minimal force necessary) can be used in non-emergency situations, then there is no other reason for it to exist except to make clear that relocation is the only situation in which no more than minimal contact can be used—a clarification that Defendant surely would be loath to make unless it wants to send the message that it is generally fine to use more force than necessary when imposing a restraint.

Moreover, the rule that a restraint (using the minimal force necessary) can be used to relocate a student is stated without any limitation that it is applicable only in emergencies, and in the Court's view the most reasonable reading of the law in this area as a whole is that there is no such limitation for the rule.

The Court will make one final observation. In many instances where a student is relocated with something that could be called "force," but only "minimal" force (the "minimal force necessary") such force may not amount to a restraint at all, such that the question of whether it is a lawful restraint would never even be implicated.

Ultimately, the apparent upshot here of Tennessee laws governing use of a restraint on a special education student allowed (even in non-emergency situations) the use of the minimum contact necessary to escort a student from one place to another, even if such minimum contact rises to the level of a restraint.

[6] The Court treats the contents of the September 11, 2016 email as Defendant's policy for the purposes of determining municipal liability. The parties do not contest that the guidance contained the email is an informal policy of Defendant.

> **I am confused by what is NOT a restraint. What are examples of what is NOT a restraint?**
>
> Do you ever hold, briefly, a student in order to calm or comfort them? That is NOT a restraint under the law. Do you ever escort a student from point A to point B and "touch" them only enough to accomplish the task? That is NOT a restraint. Do you ever assist a student in completing a task by hand-over-hand, or by using the little plastic chair with the tray attached, or anything else that restricts their movement, but is necessary to complete a task or for them to benefit from the instruction? That is NOT a restraint. Do you ever hold a student for a brief time to prevent an impulsive behavior that threatens their immediate safety? That is NOT a restraint.[7]

Doc. No. 61-6 at 3. The email goes onto to explain:

> **Then what is a restraint?**
>
> When you restrain a student IN AN EMERGENCY SITUATION for their safety and the safety of those around them. That is a restraint. When you restrain a student IN AN EMERGENCY SITUATION to protect them or someone else from injury. That is a restraint. When, IN AN EMERGENCY SITUATION, you restrict their movement against their will. That is a restraint.[8]

As a student in the special educational program, Plaintiff had a Student Safety Plan. (Doc. No. 59 at 8). The plan provided that based on certain behaviors, such as "kick[ing] at lower legs and feet of staff" or "punch[ing] staff in the arms, back head, leg," he could be "[e]scort[ed] to the

---

[7] The Court notes that there was a discrepancy between the contents of the September 11, 2016 email and the Tennessee Code. The Tennessee Code permitted a restraint to be used when it is "[t]he minimum contact necessary to physically escort a student from one area to another." *See* Tenn. Code § 49-10-1305(e)(3)(A)(ii). The contents of the email, however, defines escorting "a student from point A to point B" with only using enough "touch" to accomplish the task as something other than a restraint. Although contents of the email and the Tennessee Code differ in this respect, the Court views them as permitting the same type of conduct from educators—essentially, an educator can use minimal force sufficient to accomplish the task of relocating a student, but generally such force should be less force then when a restraint is used in an emergency situation.

[8] It is not lost on the Court that the answer to the question posed here (what is a restraint?) is unhelpful because it is entirely tautological (stating as it does only that a restraint is a restraint). To the extent that the answer is helpful in any respect, it is helpful only on a different point, *i.e.*, in emphasizing that a restraint (however defined) can be used only in emergencies. But even this advice is unhelpful insofar as it seems to ignore the important qualifier, which the Court has discerned as discussed above, that a restraint (using the minimal force necessary) can be used to relocate a student even in non-emergency situations.

Calming Room." (*Id.* at 9). The plan further provided that "[r]estraint [be] only used if the student is harming himself or staff and puts safety of self or staff in immediate danger." (*Id.* at 9).

   3. Procedural History and Plaintiff's Claim

On November 3, 2020, Plaintiff filed a complaint to initiate this action. Ten days later, Plaintiff filed an amended complaint (Doc. No. 8), which remains the operative complaint in this action, naming Rutherford County, Defendant, Campbell, and Marlar as Defendants. Campbell and Marlar were sued only in their individual capacities. (*Id.*). The amended complaint sets forth claims under 42 U.S.C. § 1983 for violations of Plaintiff's right under the Fourth Amendment (as made applicable to the States via the Fourteenth Amendment) against unreasonable seizure and Plaintiff's right to bodily integrity under the Fourteenth Amendment's due process clause. (*Id.* at 6–7).

The amended complaint alleges that Rutherford County and Defendant are responsible for the alleged constitutional violations committed by Campbell and Marlar. (*Id.* at 8). Specifically, the amended complaint alleges that the County and Defendant should be held liable on the grounds that Campbell was a policymaker with final decision-making authority. (*Id.* at 10). It further alleges that Rutherford County and Defendant hired or placed underqualified individuals when they hired Marlar and Campbell (*Id.* at 10–11).[9] Finally, it alleges that Rutherford County and Defendant failed to train Campbell and Marlar. (*Id.* at 11–13).

Defendant is the only remaining defendant in the case. The Court previously approved a settlement between Plaintiff and Defendants Campbell and Marlar, and Plaintiff voluntarily dismissed his claims against Rutherford County. (Doc. Nos. 50, 21). Therefore, the Court need only address Plaintiff's claims against Defendant. The present issue is not whether what happened

---

[9] Plaintiff concedes that there is no genuine dispute of material fact that Defendant is not liable for failing to properly hire/place Campbell or Marlar. (Doc. No. 61 at 8). Plaintiff has therefore abandoned this claim.

to Plaintiff was acceptable or whether this ever should have happened to Plaintiff; instead, it is whether Defendant is liable for what happened.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P.

56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[10] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla

---

[10] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-23); *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the

summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

One important implication from the prior paragraph is that the court should not, in determining whether one side or the other is entitled to summary judgment on a particular claim, take the approach of looking at all relevant evidence from a single perspective and then ask whether the evidence reflects a genuine issue of material fact such that neither party is entitled to summary judgment. Instead, the court must consider the cross-motions separately, viewing the evidence not from a single perspective, but rather from one perspective on one cross-motion and then from a different perspective on the other cross-motion; more specifically, the court must view the evidence in favor of the non-movant on each of the respective cross-motions, and ask whether the movant has shown the absence of a genuine issue of material fact even with the evidence viewed in the non-movant's favor.

DISCUSSION

Plaintiff brings two claims against Defendant. First, Plaintiff alleges that Defendant is liable for the constitutional violations suffered by Plaintiff because (according to Plaintiff) Campbell exercised final policy-making authority when she and Marlar dragged Plaintiff by the trousers legs down the school hallways. Second, Plaintiff alleges that Defendant failed to train Campbell and Marlar on the relocation of students within WHES and that this failure caused Plaintiff's injuries.

"A municipality may be held liable under § 1983 for a rights violation when either the municipality had an unlawful policy or practice that caused the rights violation, or a municipal

'policymaker' directly caused the rights violation." *Jorg v. City of Cincinnati*, 145 F. App'x 143, 146 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). To succeed on a municipal liability claim, Plaintiff must demonstrate both: "(1) the deprivation of a constitutional right, and (2) [that the municipal entity] is responsible for that violation." *See Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Defendant concedes that Plaintiff suffered a deprivation of a constitutional right for the purposes of summary judgment. The Court therefore addresses only the second prong in its analysis.

As discussed directly below, the Court finds that with respect to Defendant's motion for summary judgment, no reasonable jury could find that Campbell had final policy-making authority on how to relocate students within WHES such that Defendant is liable for Campbell and Marlar's conduct. The Court further finds with respect to Defendant's motion that no reasonable jury could find that Defendant failed to train Campbell and Marlar on relocating students within WHES. Therefore, based on the reasoning of the Court below, Defendant is entitled to summary judgment. For the same reasons, the Court finds that Plaintiff is *not* entitled to summary judgment, and therefore Plaintiff is unsuccessful on his motion.

 1. **Defendant's Municipal Liability Based on Campbell's Alleged Final Policy-Making Authority**

Defendant argues that it cannot be held liable for the actions of Campbell and Marlar because (according to Defendant) neither of them had policy-making authority. (Doc. No. 55 at 8). In response, Plaintiff argues only that *Campbell* was a policymaker (*i.e.*, that she had policymaking authority), and therefore the Court does not address whether *Marlar* was a

policymaker (or had policymaking authority). The Sixth Circuit in *Jorg* explained in detail what makes a person a policymaker for the purposes of municipal liability:

> Whether a municipal official is a policymaker depends on the conduct in question; the same official may be a policymaker in some situations but not in others. *Pembaur*, 475 U.S. at 483, 106 S. Ct. 1292. "[N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Id.* at 481, 106 S. Ct. 1292. Otherwise, the municipal liability standard would be nothing more than a *respondeat superior* standard—a move which has been expressly forbidden by the Supreme Court. *Id.* Accordingly, an official is a "policymaker" only when state or local law *vests* in him the "authority to establish municipal policy with respect to the action ordered," and such authority is "final." *Id. See also Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985). Thus, in order for a particular decision by a municipal official to be a "policy" decision, state or local law must give the official the authority to choose from various alternatives when making that particular decision.
>
> When municipal officials have been deemed to be making policy decisions in the past, it has not been because they were vested with the authority to make factual assessments of a particular situation, but rather, because they were vested with the authority to respond to that situation. *See Pembaur*, 475 U.S. at 473–77, 106 S. Ct. 1292 (finding that the county prosecutor's decision to have police officers use an axe to break down a doctor's door was a policy decision); *Meyers*, 14 F.3d at 1116–18 (finding that a City Manager's decision to discharge the Fire Chief in violation of the First Amendment was a policy decision); *Monistere v. City of Memphis*, 115 Fed. Appx. 845 (6th Cir. 2004) (finding that a police chief's decision to conduct an immediate strip search of his own officers when they were accused of stealing a motorist's money after a traffic stop was a policy decision); *Brotherton v. Cleveland*, 173 F.3d 552, 562 (6th Cir. 1999) (implying that the Coroner's decision to establish a protocol for organ removal was a policy decision).

*Jorg*, 145 F. App'x at 146–147.

As explained in detail above, a Tennessee statute states that a student receiving special education may be "restrained" "only in emergency situations." *See* Tenn. Code Ann. § 49-10-1304(a). And an "emergency situation" exists when a student's "behavior poses a threat to the physical safety of the student or others nearby." Tenn. Code Ann. § 49-10-1303(3). As further noted above, that same statute stated that a restraint is not prohibited where "[t]he minimum contact

necessary to physically escort a student from one area to another" is used, which the Court construes as permitting a restraint in a non-emergency setting as long as only the minimum contact necessary is used. *See id.* at § 49-10-1305(e)(3)(A)(ii).

In light of these rules regulating the use of restraints, the question for the Court here is whether the then-existing state law and policies instructed Campbell and Marlar on what degree of force was appropriate to use to relocate Plaintiff. At the outset, although disputed by the parties at summary judgment, the Court is satisfied that there is no genuine dispute that no emergency was present when Campbell and Marlar approached Plaintiff and requested that he go to class. Tennessee law states that an emergency is present when a "child's behavior poses a threat to the physical safety of the student or others nearby." Tenn. Code Ann. § 49-10-1303(3). As discussed above, the video surveillance footage submitted by Defendant clearly shows that during Plaintiff's entire interaction with Campbell and Marlar, Plaintiff's behavior was completely passive. (Doc. No. 76). Plaintiff himself would seem to agree, given that in his amended complaint, he states that "[t]he surveillance video of the incident shows that [] Plaintiff was *not threatening or attempting to harm himself or any other students or employees at [WHES]*" prior to being dragged down the hallways by Campbell and Marlar. (Doc. No. 8 at 6). Despite this assertion of fact in his amended complaint, Plaintiff now takes the position that he *was* posing a physical threat. (Doc. No. 62 at 12). In support of this assertion, he points the Court's attention to Campbell's deposition testimony in which Campbell purportedly stated that Plaintiff's behavior history indicated that allowing Plaintiff to stay in the front office may had led to violent behavior. (*Id.*). In light of the video evidence, however, Campbell's speculation about what Plaintiff may have done had he been left in the front office is not sufficient to create a genuine dispute as to whether Plaintiff posed a threat

to anyone's physical safety. The Court therefore finds that there is no genuine dispute that there was no emergency when Campbell and Marlar began dragging Plaintiff.

Given that the Court has found no genuine dispute that no emergency was present, the Court must determine whether there existed a law or policy that governed the degree of force to be used in the circumstances faced by Campbell and Marlar. An absence of such law or policy would weigh in favor of Plaintiff's argument that Campbell was a policymaker in doing what she did to Plaintiff. Conversely, on-point law or policy would indicate that she was not a policymaker in that context. As the Court has reiterated throughout its analysis herein, Tennessee law did not prohibit the use of a restraint when "physically escort[ing] a student from one area to another" as long as the "minimum contact necessary" is used. Tenn. Code Ann. § 49-10-1305(e)(3)(A)(ii). As explained above, the Court is satisfied that this provision permitted a (minimal) restraint to be used for relocation even in a non-emergency setting, such as existed when Campbell and Marlar requested that Plaintiff go to class. It therefore follows that Tennessee law provided instruction to Campbell and Marlar on how to physically relocate or "escort" Plaintiff from the front office to his classroom or the calming room—they were to do so using the "minimum contact necessary. . . ." Consistent with this instruction under Tennessee law, the September 11, 2016 email instructs that an educator can escort a student from one place to another "'touch[ng]' them only enough to accomplish the task." (Doc. No. 61 at 5).

As noted above, an individual is a final policymaker if he or she has the "authority to choose from various alternatives when making the particular decision." *See Jorg*, 145 F. App'x at 146–147. The Court is satisfied that applicable Tennessee laws and Defendant's rules regarding the use of restraint in a non-emergency setting, in an effort to relocate a student in a special education program, served as a policy that applied to the circumstances faced by Campbell and Marlar. The

Court need not determine whether Campbell and Marlar's conduct *violated* this policy; it is sufficient that a policy *existed*, which in turn necessarily means there is no genuine dispute that Campbell was not a policymaker for this particular issue or circumstance.[11]

### 2. Defendant's Municipal Liability Based on Failure to Train

To succeed on a failure-to-train claim, a plaintiff "must show three elements: (1) that [the municipal actor's] training was inadequate to prepare him for the tasks that [actors] in his position must perform; (2) that the inadequacy persisted due to the [municipality's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiffs' injury." *See Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 562–563 (6th Cir. 2011). The existence or non-existence of the third element (causation) is a factual rather than a legal matter. *See, e.g., Rosales v. City of Bakersfield*, No. CV-F-05-237OWWLJO, 2007 WL 1847628, at *28 (E.D. Cal. June 27, 2007) (noting, in connection with a defendant's motion for summary judgment on municipal liability under *Monell*, that causation is a question of fact). And if the third element were absent, that of course would be fatal to Plaintiff's claim. *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999)). "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case,

---

[11] The Court notes that its holding that there is no genuine dispute that Campbell was not a final policymaker in her capacity as principal is consistent with several other courts' findings in analogous cases. *See Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (affirming district court's grant of summary judgment given that New York City principal did not have municipal policymaking authority because the chancellor had final decision-making authority); *Barr v. Jefferson Cnty. Bd. Of Educ.*, 686 F. Supp. 2d 699, 705 (W.D. Ky. 2010) (holding on summary judgment that public school teacher was not a final policymaker because all employee policy decisions were plainly vested in the superintendent or school board); *Jaythan v. Bd. Of Educ. Of Sykuta Elementary School*, 219 F. Supp. 3d 840, 846–847 (holding on a motion to dismiss that school principal did not have final policy-making authority where plaintiffs could not identify a source conferring final decision-making authority on the principal); *M.J. v. Akron City School District Bd. Of Educ.*, 5-18-cv-577, 2020 WL 2043321 (N.D. Ohio Apr. 28, 2020) (holding on summary judgment that school principal and superintendent were not final policymakers because neither had final decision-making authority). For the reasons stated above, the Court finds that Defendant is entitled to summary judgment as to its liability based on Campbell purportedly having final policymaking authority.

and on which [she] will bear the burden of proof at trial.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). So the absence of a genuine dispute that causation is lacking is grounds for summary judgment.

Defendant argues that there is no genuine dispute that any inadequacy in the training received by Campbell and Marlar did not cause Plaintiff's injuries. (Doc. No. 55 at 24–25). As discussed below, the Court agrees.

Part of the causation inquiry is determining whether the "municipality could reasonably foresee than an employee's wrongful act would follow from lack of training." *See Gambrel v. Knox Cnty. Ky.*, 25 F.4th 391, 408–09 (6th Cir. 2022). The Sixth Circuit has identified two ways in which a plaintiff can fulfill the third requirement. "First, plaintiffs could show deliberate indifference through evidence of prior instances of unconstitutional conduct demonstrating that the County had notice that the training was deficient and likely to cause injury but ignored it." *See id.* at 562. Second, "plaintiffs could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the County had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *See id.* at 562–563. Plaintiff appears to base his failure-to-train claim on the latter theory of causation. (Doc. No. 59 at 19).

It is undisputed that Campbell and Marlar underwent crisis prevention intervention ("CPI") training. (Doc. No. 62 at 18, 4). It is further undisputed that CPI training is training in de-escalation and different types of restraints that is designed to assist in dealing with children with behavioral issues in the most constructive and best way possible. (*Id.* at 5). Plaintiff likewise does not dispute that the CPI training provided to Marlar included an admonition to use the least restrictive

approach appropriate for the situation and to assess the situation continuously to identify the earliest opportunity to disengage safely. (*Id.* at 10).

In support of his failure-to-train claim, Plaintiff argues that the training was inadequate because the CPI training did not teach educators how to move a child from one place to another without the use of a restraint. (Doc. No. 59 at 19–20). Even assuming that Campbell and Marlar's actions did not constitute a restraint (which the Court is dubious of), the Court is not persuaded that Plaintiff could establish that this alleged inadequacy was closely related to or actually caused Plaintiff's injury. As stated above, to succeed on a failure-to-train claim, a plaintiff must demonstrate that "the inadequacy is closely related to or actually caused the plaintiffs' injury." *See Harvey*, 453 F. App'x at 562–563. Campbell's and Marlar's conduct was nothing short of outrageous. Dragging a person, not least a child in a special education program, by his or her trouser legs (in public, no less) against their will presents for that person both a risk of physical injury and a shocking kind of violation of that person's bodily autonomy. Depending on the nature of his or her special needs, a child in this program may not comprehend why he or she is being treated in this manner, and also may not be as equipped to speak up for himself or herself to the administrators or his parents. This is all to say that Plaintiff has not persuaded the Court that the alleged lack of training on relocating a child caused Plaintiff's injury; surely, any objectively reasonable educators know (even without being specifically so advised in training) that dragging a child who is enrolled in a special education program by their trouser legs through the school hallways is plainly unacceptable.

In summary, the Court agrees with Defendant that there is no genuine dispute that any (alleged) inadequacy in the CPI training did not cause Plaintiff's injury. Therefore, Defendant is entitled to summary judgment on Plaintiff's failure-to-train claim.

## CONCLUSION

The Court need not reiterate here that what happened to Plaintiff was very wrong. But what it does need to do is determine whether Plaintiff can avoid summary judgment with respect to his effort to make this particular (municipal) Defendant liable for what happened to him. The Court concludes that he cannot.

For the reasons stated herein, Defendant's motion for summary judgment at Doc. No. 54 is GRANTED. For the same reasons, Plaintiff's motion for summary judgment at Doc. No. 57 is DENIED. This is the final order in the case. All relief being denied, the Clerk of the Court shall enter final judgment. *See* Fed. R. Civ. P. 58(b)(1)(C).

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE